The next case on the docket is Vorhees v. E-Insurance. So we'll proceed with appellant's argument first. The case is set for 15 minutes per side and if you'd like to make, the appellant wants to make a rebuttal, please try to stop preserving, you know, while some time is left. Thank you, Your Honor. Good morning. May it please the court. I'm Tom Mumford. I go by counsel for the appellant, Justin Vorhees, and I would like to reserve four minutes for my time for rebuttal. It appears that the crowd has dispersed now. I was gonna say, where are your supporters? I guess they're not as interested in the issues of insurance claim handling practices. No, this is an important case. Yeah, we are. It is an important case, thank you, Your Honor, and I do want to just say one thing at the beginning about why I feel this is an important case. The citizens of the state of Washington enacted the Insurance Fair Conduct Act in 2007 by popular referendum because they were tired of insurance companies delaying and denying payment of meritorious claims and being forced to litigate to obtain insurance benefits that they had paid for. That's what this case is about. The district court's decision granting summary judgment to e-insurance was erroneous and should be reversed for three reasons. The first one is that the court failed to construe the evidence in the light most favorable to Mr. Vorhees, and I'll go into that at some length. Second, the court improperly excluded some of defendants' conduct from the scope of its analysis, particularly the conduct that occurred after the case was filed. And third, the decision contains factual assertions that are just flat wrong, not consistent with the record, and the decision itself is internally inconsistent and contradictory. What's the second one? Sorry. The second one was that the court improperly narrowed the scope of its analysis and excluded e-insurance's conduct after litigation from its analysis of its claims handling practices. Okay. And that goes to the adversarial issues, which I'm sure we'll talk about and counsel I know will talk about. So let me go to the first issue, which is construing the evidence in the light most favorable to Mr. Vorhees. And by the way, all of these claims arise under the Insurance Fair Conduct Act, Common Law Bad Faith, and the Consumer Protection Act, but that's a mouthful. And so for purposes of our argument today, I'm going to just reduce that to extra contractual claims for ease of reference, unless the court has questions. I mean, it's the same fact record, right? It's just a question of whether it violates one or all of the three. Correct. And there's so much overlap between the three, it seems easier to do it that way. Understood. Generally, the reasonableness of an insurer's claim handling conduct involves, always involves, questions of fact that can rarely be resolved on summary judgment. And that's why we've cited many cases to the court that show that, even just the year or two before this case and the year or two after this case, these issues have come up over and over and over again, and the court almost always finds that summary judgment is not appropriate because there's just too many factual issues. And that's the case here, too, on the underlying claim. What's your best argument that the offer that eAssurance made was unreasonable on the facts before us? Well, I guess the best argument there and the best evidence for that is that we submitted, originally eAssurance took that position because they said they didn't have supporting documentation for the income loss portion of the claim. And you're not disputing that what you were able to provide was not complete for the entire time period of the claim loss, right? He only had some of the records from the business that he started with regard to pay and revenue. I would submit that we submitted all the records that were available. But my question was, did it cover the entire period of time asserted in his claim for lost revenue? It did, and I was starting to answer your question. This is a really important point, is that we submitted an expert opinion as part of our expert disclosure from our economist expert, and it stated that Mr. Voorhees had $40,000 in economic losses related to the loss of his business. That information was never considered by eAssurance. eAssurance should have, now I'm getting to my second point, but I'll the claim in light of new information. Even when the case is in litigation, because we're proceeding on two tracks. We have the litigation track, but we also have the claims adjusting track. This is an open claim. This is a dynamic claim. It's not a static claim, and the analysis of the court has to be on eAssurance conduct, readjusting the claim at every stage. I understand, but I don't think you've totally answered my question in terms of what was the underlying documentary proof that the claimant submitted to the adjuster to substantiate the claim of $40,000 or whatever it was. He submitted his, all of his business records, his profit and loss statements. He submitted the bank, or his tax returns that he did have. He didn't have a tax return for 2018. That's why it And he didn't have payroll or receipt records for all the period as I read the record. Did I miss something? He had some payroll records and some he didn't. Okay, so there is a gap. There's a gap here in terms of his ability because he just didn't have any more records. He produced everything he had. He produced everything he had, but I will also say this. This is a very important point. The economists that did the calculation used the exact same information that we provided to insurance in calculating that Mr. Voorhees' losses were $40,000 as a result of the loss of his business. And there's another very important point. That's just straight math from an economist's standpoint. That doesn't address the issue of general damages. The fact that he left his desk job to start a job where he could be out in the field and then had to give up that dream because he could no longer operate his business is a I thought there was a dispute between the claimant and the insurance company over whether or not the accident was the cause of the failure of the business versus the failure of some principal customers to pay what they owed for work that he'd done for them. That's the argument that insurance is trying to make and it's not supported and I'll tell you why. He needed to be on site with customers managing jobs in order to maintain good customer relationships. He had a problem with one customer in part because he couldn't be there and that was one of the reasons that he had a cash flow problem. So there were big customers that didn't pay him what he said they owed him. That's correct. So he found himself cash short. He found himself cash short and he said in his deposition that that was because he was not able to be there with the customer and he had to hire replacement managers who were really unreliable and he ended up firing about five or six of them. Well, Jim, one of them stole from him, right? And one of them stole from him and that was all because he couldn't be on site to be policing the jobs. You mentioned delay and that the statute was adopted, the state statute was adopted in part because of concern about delayed resolution of claims. But the delay record in this case is I think not favorable to your client because or I just want to put that out there so you can respond. I agree with you. It seemed like there were a lot of calls from their team over to your team that weren't answered. That's not part of our claim. Claiming that they didn't pay soon enough up until we filed our case is not part of our claim. Oh, that's good. Okay. So what's your best shot at what they did wrong? As far as delayed payment, well, there's... I understand delayed payment's not part of your claim. So what is your claim? So what they did wrong is they did an inadequate investigation. And what the court did wrong is it didn't read our expert's like 40-page report. I can't remember the number of pages, but it was exhaustive and it was very detailed. And it went through and indicated about six different ways in which insurance failed to follow industry standard in evaluating the claim. Okay. And so in your sort of punchline, if you will, I think you're telling me that you think that the judge didn't apply the appropriate standard. You know, I appreciate that. But if you could just do it from your team's perspective, you think that the court should have looked at that and decided that the offer that they made was inadequate? Yes. Okay. Yes. Why? Because, let me go through a couple of the things that our expert said. The expert failed to, well, first of all, the insurance, let me back up. Insurance valued the general damages on speculation and conjecture, which it can't do. It based its general damages award on looking at some Facebook posts and drawing medical conclusions from looking at Facebook posts. But the social media report that it commissioned only looked from the date of the accident forward. If they had done an adequate investigation and looked at all of his social media posts, which it could have just done by going to the Internet, it would have seen that prior to the accident, Mr. Voorhees, who is an extremely active individual, who is a competitive snowboard rider and was in competitions, getting 20 feet off the ground and doing things on almost a daily basis, was not doing those kinds of things after the accident. But I thought the social media report included photos of him skiing and engaging in sort of high-activity sports. He took a hiatus from those activities for a while right after the accident, and then he started to test to see whether he could go back to his activities, but not at the same level he had engaged in before. He was doing really extreme stuff before. He was doing stuff that he loved to do, but it was careful and cautious and limited. And insurance didn't look at the right basis for a comparison because they didn't look at his social media before the accident, only after the accident. To get back to Judge Christian's question, though, what's your explanation for why, I don't know if it was you or prior counsel, why there was no response to the multiple requests for information that went unanswered from the insurance company? Respectfully, Your Honor, that really is a red herring issue because we're not claiming that the delay in making the offer or payment is part of our plan. But you're saying they conducted an inadequate investigation. They're saying, we asked multiple times for supporting documentation and more information, and we were met with a wall of silence. I don't think, what they wanted was something that we didn't have. They wanted, they wanted Why couldn't you just respond? I mean, send them a letter or send them the same letter 10 times saying, I don't have anything more to supply. I don't know, but I don't think that that is, I don't think that is a pertinent issue to the case. Because you're not making a claim for delay? Because we're not making a claim for delay. And because when we did provide our economist report, insurance didn't, didn't reevaluate the claim. Okay, so what's the sequence of events? There's, you know, some imperfect communication, right? And then there's an offer.  Right. And of course, his spouse's claim was, we know what happened over there. Right. But this was a lesser offer. Right. Right. And then what's the next thing that happened in the time that we should be considering? Well, there was a complaint to the insurance commissioner, where insurance responded and said, we've made a fair and reasonable offer. And then suit was filed. Then after suit was filed, then we submitted our economist report, which tabulated the economic loss from the loss of the job, which insurance didn't evaluate. If they had evaluated that. Okay, wait, wait, wait. So, so then keep, if you could keep, I know that sequence. Then, then what happened? Then the parties engaged in discovery. So there's a social media, okay, yeah. And there's a social media report. I'm trying to figure out what happened if you had an opportunity to respond to the social media report. I think the social media report is very damaging to your client. And you're making good point, which is, you got to look at it longitudinally, he was even more active before.  That's correct. Did you have an opportunity to communicate that? Did you have an opportunity to respond? Where did things break down? Insurance did not, insurance did not tell us what, what the concerns were with the social media report and did not give us an opportunity to respond. And our experts specifically highlighted that as one of the deficiencies that in their investigation, among many others. I thought, counsel, that they had asked you for certain documents and that you didn't respond. I think these are the wage loss documents that we've been discussing, which are that we gave him everything that we had. We didn't withhold anything. We gave them everything that we had. It just wasn't what you would hope to have. He is starting a business and as you know, self-employed people have a hard time documenting their income loss. It's not like he can go to his employer, ask for a doctor's note, and then just show how many hours he didn't work. I'm not trying to split hairs, but when you say you gave him everything you had, you gave him everything that existed. It's not like you didn't have documents in your possession that were extant somewhere. You're telling us that they didn't exist because it was a startup. Right. We did it three times. We did it before suit, we did it in our initial disclosures, and we did it in discovery. And our expert used that same information to come up with his. Did you ever respond to their request for documents by saying, we don't have any further documents? I do not recall. I'm sorry that I don't remember whether we did. I think certainly by the time we got into litigation, we did. We said, you have everything we have. This is all we have. So your claim is that they breached their duty by inadequately investigating. Yes, inadequately investigating. And basically, remember, we have competing reports from experts that are diametrically opposed. That right there is enough to preclude summary judgment. The court should have denied summary judgment just based on that. Can I ask you a couple of record clarification? Did insurance pay the $10,000 personal injury protection to your client? Well, they paid for medical bills up to $10,000. So they exhausted that $10,000. And then with regard to his wife, they gave her the policy limits of $100,000. But she had better documentation with regard to student loan. She lost a scholarship. So it was pretty easy to see that. So it was pretty easy for her. And the insurance company paid that. Correct. Right. So your claim just has to do with the failure to pay more than $10,000 while the insurance company tried to get answers to these questions that we've been asking you about. Not so much a failure to pay, but an inadequate investigation. And then on our motion for summary judgment. You keep saying inadequate investigation. And then you keep telling us that it's irrelevant that you didn't respond to their request for more information. And I'm having a hard time jiving the two. It seems to me that if you weren't responding to their request for more documentation, you were causing the delay in payment and the ability to adjust the claim. The wage loss portion of the claim is only one part of the claim. We also have the general damages, which was inadequate, as outlined by our expert. I hope you have a chance to take a look at the expert report. We did. Okay. Thank you. I see that I'm about out of time. Is that my total time or is that only up to my rebuttal? That's your full time. Okay. Well, I apologize. I did have a few other comments. I wanted to make a rebuttal. I'll give you an extra two minutes for rebuttals. Thank you very much, Your Honor. Good morning, Your Honors. May it please the Court. My name is Elliot Harris. I'm here on behalf of eAssurance Insurance Company in this case. eAssurance respectfully requests this Court affirm the District Court's order granting our motion for summary judgment and denying the motion that was filed by the plaintiff, the cross motion for summary judgment. This is a UIM and bad faith insurance lawsuit. I think the Court has really hit the main issue, which this is an evaluation dispute between eAssurance and the claimant in this case. What was the value of the lost wages and what was the value of the general damages? This was a challenging case for eAssurance to evaluate given the lack of documentation to support the wage loss claim. As I think Judge Talman pointed out with regard to the appellant's wife, it was much easier to document the wage loss claim. If it was an employee that had a job where they had a doctor's note that said this person can't work for eight weeks and they make X amount of money per week, that's easy to document a wage loss claim. In this case, we had a very, bless you, we had a very difficult wage loss claim. eAssurance, the claim adjuster, had a challenging task to really evaluate how much was this business, how much of a lost wages did Mr. Voorhees sustain? We had a business that had only been open for a month. He provided limited, very incomplete, lost profit and payroll documentation to eAssurance. It was difficult to calculate, was this business going to be successful since it was brand new? If so, how successful was it going to be? How much money was it going to make? It was very, very challenging. To answer, I think, Judge Christian's question about the sequence of events, after the demand is made, the UIM demand is made, that is in May of 2022, there was a discussion between the eAssurance claims representative, his name is Mr. Wild, and I believe it was with plaintiff's counsel, and then after that, that was when the social media report was run. The social media report came back. That was discussed then with the appellant's counsel.  I believe it was at one point in time, Your Honor. I believe it was. It just seems to me, I couldn't actually see that in the record and it seems to me to beg the question, if you've produced it, then you've got an opportunity to say, oh, you need to look at the longitudinal history, and I didn't see that for what it's worth. It was certainly discussed. That is in the record. And then subsequent to that, there was an impact. I'm sorry, can I ask one more question? That social media report certainly went to its general damages because it documents, to use a term, it provides evidence of certain activities. But it also goes to wage loss? Because there's one posting about why the business was going to fail because one person hadn't paid. Is that right?  There was a Facebook post that was put up in 2019, so this is one year after the accident, that indicated that the business had to be closed because a number of clients hadn't paid. And there was testimony that was taken during the plaintiff's deposition in this case specifically as to what those circumstances were. But that's why I'm asking about the sequence of events. That seems perfectly reasonable to me, and it's reasonable that an insurance company would have an adjuster that would give them cause for pause. And so I would think that would be communicated. I'm trying to figure out why we're in court. I would think that would be communicated and there would be a response. What happened? Why wasn't that? There was. That was communicated to the plaintiff. The plaintiff said, well, how about I have Mr. Voorhees come and talk to you? We'll do it off the record. It won't be recorded. You can ask him these questions yourself. That was done. The claim was re-evaluated and then another offer was made. But what opposing counsel is arguing is that the sequence winds up at a place where there are competing economists, economic reports, and his, you know, his main thesis is that the district court didn't apply the correct standard at summary judgment. So do you want to move to that? Because that seems to be the question. There are competing claim handling experts, I think is what he was referring to. So each side has a claim. The economist report was not produced until the course of the litigation. I think it was actually a year after the litigation. Oh, wait. So that sequence does matter to me. So I understood him. Maybe he'll have a chance to correct me. I understood him to be telling me that there were competing economic reports from economists. No? One of his criticisms of e-assurance is that we did not hire an economist during the course of the claim investigation. I believe the record shows the economist report was produced during the course of the litigation itself. Quite a bit after the litigation.  So I'll go back and look at the chronology because maybe that's the disconnect. Yeah. Okay. And so to get back to your Honor's question, though, the social media report did relate both to the business and to the general damages. And then also as to other information in terms of activities that were going on, and we could piece through the medical records what Mr. Voorhees was reporting to his doctors and what he was actually doing. What was in a chronology that was provided to e-assurance to support the UIM claimant? It had conflicting information. On the one hand, we were being told he couldn't engage in any of these activities, such as mountain biking, such as hiking. We found social media posts that contradicted that, that showed that he was still engaging in these activities. Again, getting back to the bigger issue, from a claim handling perspective, Mr. Wild is looking at this thing. I'm having a hard time making sense because I've got incomplete, conflicting information I'm getting from the insured. Despite that, I'm going to give him a $5,000 credit. I'm going to say there probably was some lost wages here. I can't figure out. I can't determine with any certainty, any accuracy how much he actually sustained in terms of wage loss. He then communicated that to the plaintiff and said, here's where I'm at. Show me why I'm wrong. Give me some other documents, some other evidence. That's when the suit was filed. And then during the suit, an economist report came in showing $45,000, during formal discovery? Correct, Your Honor, yes. Another thing that came up during the course of formal discovery is there was a request by e-assurance to Mr. Voorhees to produce other social media postings. That was opposed. I know this isn't before the court, but I just wanted to point out in terms of the context. We actually had to go to court to get an order of compelling production of these additional social media documents. I think it is mentioned in the record that is before this court because there was a supplemental brief that was filed as part of the summary judgment because those documents, those social media postings, were not even produced until during the middle of the summary judgment briefing before the district court. I'm happy to address any other issues the court might have. Well, I take it your position is that I think there was some dispute between the parties over whether or not e-assurance's internal employees described the amount included in the offer as a disputed amount or an undisputed amount. If you could address that, I would appreciate it. Sure. Of course. We're talking about the Beasley issue. Beasley is the Washington Court of Appeals decision. The Beasley case is a 2022 case. It's a court of appeals case. It was petitioned for review by the Washington Supreme Court. They denied it. It remains the law. The courts that have come after Beasley have narrowed it significantly. A lot of these are federal ... One case. I'm sorry? Division one. Beasley is a division two case. Two.  The courts ... The decisions mainly out of the federal district courts that have looked at Beasley have narrowed it significantly and limited Beasley really based on the facts of that case where a deposition was taken of the claim handler and the claim handler said, yeah, that amount of money is undisputed. There is no set of facts, no scenario I can see where we are not going to owe that amount of money. And then they said, okay, well, then why don't you pay it if you're not disputing it at all? And they said, well, we're waiting for the claim to settle, finally settle. And they said, well, you can't do that. You can't use that as leverage to try to negotiate settlement of the overall claim. That's not the situation we have in this case. The deposition testimony they cite to is testimony taken during this case where they were asked, was the offer that was made during the course of the claim fair and reasonable at the time it was made? And then there was some other testimony of the insurance's corporate representative. Do you still believe that's a fair and reasonable offer? Basically saying, yeah, we stand by that it's the same offer that we made. It's not that it's undisputed. It's not really a magic word. We're not saying we owe that amount of money under any circumstances whatsoever in this case. And that kind of gets to the counterclaim, which I know we haven't really talked about. I'm happy to answer questions about the counterclaim, but there is a scenario here where we would not owe any money under this policy. So it's not an undisputed amount. Are you now suggesting he engaged in fraud? Which would vitiate the policy altogether? Misrepresentation. OK. Yeah. The policy. We don't want to call it fraud, but we're going to use a softer term. The policy says it's fraud or misrepresentation. You can read the counterclaim is 48 paragraphs. A lot of it's based on the social media report, the conflicting information that conflicted with medical records, conflicted with information that was being provided to eAssurance. We thought there was a colorable claim for misrepresentation based on that. That's the basis for it. And so that underlies your earlier answer to our questions that your employees thought that the offer that was made was fair and reasonable to compromise the claim, not that the claim was undisputed. Correct. eAssurance at no point has said there's no set of circumstances that we will owe X amount of money under the UIM claim. They made offers. They were trying to negotiate a disputed claim, but the medical bills, the special damages minus the wage loss, which we've talked about and was difficult to calculate, those were all paid for out of the PIP and by the payment by the tortfeasor, $25,000 by the tortfeasor's liability carrier. So, really what we're talking about is this unclear wage loss claim and general damages, which are what someone says they are. There's no mathematical calculation for what those are. I'm happy to answer any other questions the Court has. I don't have anything. Okay. Thank you. Thank you, Your Honor. I'd like to just speak to the fraud claim very briefly. All of the defense witnesses were asked, was there any evidence of fraud in this case? Every single one of them said under oath, no, there was no evidence of fraud. One of our claims is that maintaining that fraud claim now, after they've also testified under oath that Mr. Voorhees is entitled to UIM benefits, they all said that, too. They said he's entitled to UIM benefits, and they said that $55,000 is a fair and reasonable amount. Counsel, I thought I just heard your friend on the other side say that their statement was about fraud or misrepresentation. Well, I asked about fraud, but I assume that that also included misrepresentation. Well, no, Mr. Early. Okay. Well, the question, so thank you, Your Honor. That's true. I did not ask the question about misrepresentation. I do want to say also that all of the medical bills were accepted by insurance. They didn't quibble with any of the medical bills. In other words, they were saying he was injured, and this treatment was reasonable and necessary and related to the accident. How do you, can you help us with regard to Beasley? Because it does seem to me to be significant that none of the insurance employees testified that they thought that the amount of the claim was undisputed. They were clear, I think, in their answers that they thought the offer that was made was fair and reasonable. Let me answer it this way. Okay. An insurance company is supposed to do a fair and reasonable evaluation of a claim. They come up with a claim decision and a claim value. I cannot imagine any scenario where insurance could go into court and argue before a jury. We said in our depositions that he's entitled to $55,000. That's a fair and reasonable amount. He gets UIM benefits, but he shouldn't get any because he misrepresented things when they also testified that there's no fraud. Now, maybe, I'm sure that if I would have asked him was there misrepresentation, I'm sure they would have said there was no misrepresentation because the scope of the question was along that vein. Did you see anything? I think the problem I'm having with your argument is that practicing lawyers settle claims all the time without admitting that the amount that they're offering is undisputed. They're offering an amount in the hope that they can get the case resolved, and it usually is less than the amount that the other side is asking for. A good settlement usually is less than what each side wants to accept or to pay. Let me come back to Beasley. After the Beasley decision came down, I'm a personal injury attorney, so that's most of my practice, we started getting, and this is in the record, we started getting checks from insurance companies on UIM claims saying, per Beasley, we're tendering this amount now because we know that this part is owed at least this. It's not saying this is all you're going to get. It's just saying this part we believe he deserves. That's the way insurance companies should operate in the first party context. That's what happens in other first party contexts. For example, if your house burns down in a fire, they don't say, well, let's evaluate the whole claim and then we'll decide whether to put you in a hotel or whether to start fixing your house. They pay as they go because it's a first party claim, and the insurance company is supposed to look out for the best interest of the insured and protect them. There's no reason why that shouldn't be happening in the UIM context as well. State law says that the insurance company is entitled to stand in the shoes of the underinsured party and assert whatever that party would be privileged to do in litigation as long as they're acting in a fair and reasonable manner. They're wearing two hats. They have the adversarial litigation hat on the claims that are in dispute. They also have an ongoing obligation to continue to adjust claims at the same time. You don't dispute my recitation of the law, do you? No, no, that's correct as far as the issues that are at issue in the litigation. But for example, asserting a fraud claim, that's not something that they could have asserted by stepping into the shoes of the tortfeasor. The tortfeasor couldn't have asserted that fraud claim. Counsel, I see a red light here and zero overtime on the extra minutes that I already gave you. Judge Kristen? Well, I just have one. Maybe in bullet points because I don't want to get in trouble with my presiding judge here. But can you just tell me, you started by saying you thought that the district court didn't correctly apply the summary judgment standard. If you could just give me bullet points of what disputed issue of fact you think should have prevented entry of summary judgment here. Didn't read the expert report in the light most favorable to the non-moving party. Mr. Arguello's detailed expert report provides probably five or six different reasons why the claims investigation was inadequate that would preclude summary judgment.  So you gave me that one earlier. Is there anything else? Well, and then the second point was that it artificially truncated its analysis by not looking at the economist report that came in after litigation. Okay. Got it. It should have re-evaluated the claim. And please look at Jeremy Broad's testimony at 58 to 60 in the record. That's ER 58 to 60. Please take a look at that because I think it addresses it. Thank you, Your Honor, for the extra time. I appreciate it. Thank you, counsel.  This case and the others argued shall now be submitted and the court will adjourn for the day. And we thank counsel on both sides of this case for their excellent arguments. Thank other counsel as well. With that, we are adjourned. All rise. Court is adjourned.
judges: GOULD, TALLMAN, CHRISTEN